UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **UNITED STATES OF AMERICA** <br><br> v. <br><br> **BRANDON MCINTYRE,** <br><br> **Defendant** | Crim. No. 16-13 (KM) <br><br> **OPINION** |

This matter comes before the Court on the post-trial motion of the defendant, Brandon McIntyre, for a judgment of acquittal, pursuant to Fed. R. Crim. P. 29(c), or in the alternative for a new trial, pursuant to Fed. R. Crim. P. 33. (ECF nos. 118, 127) McIntyre was convicted of two counts of production of child pornography; online enticement of a minor to engage in criminal sexual conduct; interstate extortionate threats; and stalking.

The charges were based on online communications and text messages with underage girls. Mr. McIntyre argues, as he did at trial, that the two victims could not identify him because they never met him face-to-face. Ample independent evidence, however, ties the defendant to the communications and the Facebook accounts and phone that were used.

Account records establish that the accounts belonged to Mr. McIntyre. Internal evidence from the communications, including photos of McIntyre, further ties them to the defendant.

On the witness stand, Mr. McIntyre admitted that the accounts were his and that he communicated with the girls. He testified, however, that a friend or friends had access to his phone and that they must have been responsible for the particular communications that were criminal in nature. The jury was not required to credit McIntyre's implausible testimony, and obviously it did not.

1

Mr. McIntyre's contention that his detailed, recorded confession was coerced or inaccurate was placed before the jury, which must be presumed to have rejected it. There was no pretrial motion to suppress it, and none of the surrounding circumstances suggest that suppression would have been appropriate.

Finally, the government produced Rule 404(b) evidence, consisting of communications with adult women. This evidence corroborates the identification of McIntyre as the person who engaged in the communications underlying the criminal charges.

For the reasons expressed herein, the motion will be denied.[1]

## I. Procedural Background

On April 4, 2017, Mr. McIntyre was charged in a Superseding Indictment containing six counts. (ECF no. 38) Counts One and Two charged him with production of child pornography, in violation of 18 U.S.C. § 2251(a) & (e). Count Three charged him with online enticement of a minor to engage in criminal sexual conduct, in violation of 18 U.S.C. § 2422(b). Counts Four and Six charged him with making interstate extortionate threats, in violation of 18 U.S.C. § 875(c). Count Five charged him with stalking, in violation of 18 U.S.C. § 2262A(2)(B). Counts One through Four involved communications with Victim A; Counts Five and Six involved communications with Victim B.

---

[1] In this Opinion, government exhibits are designated "G." Because the trial transcript ("Tr.") is numbered sequentially, transcript citations are identified by page number only. For ease in locating the correct volume, however, I furnish the following table:

| Tr. vol. 1, pp. 1–226 | (2/20/2018) – filed as ECF no. 119 |
| Tr. vol. 2, pp. 227–486 | (2/21/2018) – filed as ECF no. 120 |
| Tr. vol. 3, pp. 487–843 | (2/22/2018) – filed as ECF no. 121 |
| Tr. vol. 4, pp. 693–844 | (2/23/2018) – filed as ECF no. 122 |
| Tr. vol. 5, pp. 845–998 | (2/26/2018) – filed as ECF no. 123 |
| Tr. vol. 6, pp. 999–1174 | (2/27/2018) – filed as ECF no. 124 |
| Tr. vol. 7, pp. 1175–1247 | (2/28/2018) – filed as ECF no. 125 |

Jury selection began on February 20, 2018. The trial occupied seven court days. The defendant made a motion for a judgment of acquittal at the close of the government's case, which was denied. (Tr. 943) The defendant waived his right to remain silent and testified on his own behalf. (Tr. 945) On February 28, 2018, the jury found the defendant guilty on all six counts. (ECF no. 117)

On March 2, 2018, Mr. McIntyre filed a post-trial motion for judgment of acquittal, under Fed. R. Crim. P. 29(c), or in the alternative for a new trial, under Fed. R. Crim. P. 33. (ECF no. 118) On April 2, 2018, in accordance with a briefing schedule set by the Court, he filed a brief in support of that motion. (ECF no. 127) The government has filed a brief in opposition. (ECF no. 128)

## II.   Standards Under Rules 29 and 33

Under Rule 29, a defendant who asserts that there was insufficient evidence to sustain a conviction shoulders "a very heavy burden." *United States v. Anderson*, 108 F.3d 478, 481 (3d Cir. 1997) (quoting *United States v. Coyle*, 63 F.3d 1239, 1243 (3d Cir. 1995)). The court cannot substitute its judgment for that of the jury. Hence it must view the evidence, and all reasonable inferences therefrom, in the light most favorable to the prosecution, resolving all credibility issues in the prosecution's favor. *United States v. Hart*, 273 F.3d 363, 371 (3d Cir. 2001); *United States v. Scanzello*, 832 F.2d 18, 21 (3d Cir. 1987). Having done so, the court must uphold the conviction if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Accord *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430-31 (3d Cir. 2013) (en banc) (reaffirming principle and reversing a line of drug conspiracy cases that seemingly undermined it); *United States v. Silveus*, 542 F.3d 993, 1002 (3d Cir. 2008) (issue for trial or appellate court is "whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence"); *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002).

3

The standard under Rule 33 is more general; a court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. When a defendant seeks a new trial claiming that the verdict was against the weight of the evidence, the court's review is less restricted than it is under Rule 29. "However, even if a district court believes that the jury verdict is contrary to the weight of the evidence, it can order a new trial 'only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted.'" *United States v. Silveus*, 542 F.3d at 1004-05 (quoting *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002)). "Such motions are not favored and should be 'granted sparingly and only in exceptional cases.'" *Id.* at 1005 (quoting *Gov't of Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987) (citations omitted)). A Rule 33 motion may also be based on an alleged error or combination of errors at trial. Borrowing the appellate concept of harmless error, district courts have held that a new trial will be ordered when it is "reasonably possible that such error, or combination of errors, substantially influenced the jury's decision." *United States v. Crim*, 561 F. Supp. 2d 530, 533 (E.D. Pa. 2008) (citing *U.S. v. Copple*, 24 F.3d 535, 547 n. 17 (3d Cir. 1994)), *aff'd*, 451 F. App'x 196 (3d Cir. 2011); *accord United States v. Bryant*, Crim. No. 07-267, 2009 WL 1559796 at *6 (D.N.J. May 28, 2009).

### III. Communications with Victim A and Victim B

The internet communications on which the charges were based were well documented and placed in evidence in hard copy form. (G2, G13) The evidence demonstrated that someone—independently proven to be the defendant, *see infra*—made contact via Facebook with "Victim A", aged 12, and "Victim B", aged 13 or 14.[2] Both victims testified about the words and images contained in the records and described the impact that these communications had on them. (Tr. 703–725; Tr. 726–745)

---

2    Victim B's 14th birthday occurred during the underlying events.

4

### A. Victim A

The August 2013 exchanges with Victim A were introduced in evidence as G13. Victim A revealed very early that she was 12 years old. (G13 p. 15858–59) The defendant stated that his father was a police commissioner and that he was in training to be a trooper. (p. 15860) He sent clothed pictures of himself (pp. 15906–16), and pictures of his penis (pp. 15869, 15917). He insistently pressured Victim A to send nude pictures of herself and of her genitals in particular. (*E.g.*, pp. 15919–35) When she resisted, he threatened to arrange for Victim A to fail her classes and have detention every day, and stated that his father, the police commissioner, would look up her father's name and address. (p. 15935) When Victim A continued to resist, he threatened that she would go to jail for five years and receive a fine of $3500 for failing to comply with an officer's order. (p. 15937) Her will overborne, Victim A gave in and sent a picture. (pp. 15937–38) M

McIntyre continued to press Victim A to send more, different, or more explicit photos. In response, Victim A at one point blocked Brandon from her account. Almost immediately, she began to receive messages from "Katie Thompson," an alter ego account maintained by the defendant. (G3) "Katie" threatened that Brandon was arranging the "paperwork" for Victim A to go to jail for 10–15 years and be fined $3500. (G3 p.921) "Katie" predicted that Victim A would never see her parents again and might be killed in prison, unless she unblocked her account. (G3 p. 922–23)

Shortly afterward, Victim A unblocked her account and the communications with "Brandon" resumed. (*See* G13 p. 15988) McIntyre then threatened to tell Victim A's parents about their contacts; threatened that her parents would go to jail; and threatened that Victim A, too, would go to jail, where she would be raped. (pp. 15990, 15994–96) Victim A gave in and sent McIntyre additional sexually explicit pictures of herself (pp. 15998, 15999, 16001; G 13a–13d)

McIntyre also sent angry messages seemingly intended to eliminate a rival, a person he identified as Victim A's boyfriend. He threatened to have the

5

boyfriend sent to jail, where he would be raped, and would also face the death penalty. (pp. 16015, 16016, 16020)

In her trial testimony, Victim A corroborated the communications summarized above, and confirmed that they put her in fear. (*See* Tr. 708–17.)

### B. Victim B

In the March 2014 exchanges with Victim B, contact was initially made by "Katie Thompson," who handed off communication to her friend "Brandon." "Katie" approached Victim B as a confidante and vouched for Brandon, who then communicated directly in his own name. Early on, it was established that Victim B was 13 years old, and would soon turn 14. (G2 p. 481) Brandon sent clothed photographs of himself, recognizable to the jury as such. (pp. 486–90)

"Katie" gave Victim B Brandon's phone number, (908) 514-0219, and the two began to text each other. (G2 p. 496; Tr. 736–37) In text messages, Victim B testified, Brandon pressured Victim B to meet him for a date in New Jersey or at a cabin in Lake Placid, New York. (Tr. 738) She refused, saying she already had a boyfriend. (Tr. 738–39)

Threats followed–not via the "Brandon" texts, but via the "Katie" Facebook account. "Katie" messaged Victim B that she had angered Brandon, who was talking about getting the Mafia to "go after the dude" (Victim B's boyfriend). (G2 p. 528; Tr. 740) Victim B expressed fear and reluctance, to which "Katie" replied that she should "just do one of the things out of state." (G2 p. 531; Tr. 742–43)

Later "Katie" said that she would report Victim B's parents for abuse, and that they would be imprisoned and never permitted to see her again. She added that Victim B's boyfriend, too, would never see her again. (G2 p. 539) Escalating, "Katie" then said she could have Victim B's family killed, tie her up and make her watch. (G2 p. 557–58) When Victim B referred to going to her guidance counselor, "Katie" threatened to have her parents "tortured and killed." (G2 p. 563; Tr. 743) Katie told Victim B to "just go on the f—ing trip!!!!" and asked if Victim B would "like [her parents] to be butchered right in front of [her]." (G2 p. 564) Shifting her ground, "Katie" then wrote that Victim B's

6

parents, for "mistreat[ing]" her, were looking at "a 3 yr state prison term for one and 25,000 fine and permanent loss of kids and the other is child neglect which is up to 5 yrs in prison permanent loss of children and a 20,000 fine." (G2 p. 566)

Victim B, in direct testimony, corroborated the above account, and testified credibly to having been placed in fear. (*See* Tr. 726–45.) The contacts ceased, however, after she reported the messages to her school guidance counselor. (Tr. 745)

## IV. Discussion: Evidence Identifying Defendant

The defendant's motion focuses on his contentions that (a) the evidence did not establish that he was the person responsible for the communications underlying the charges; and (b) his lengthy, recorded confession to FBI agents on the date of his arrest was coerced and inaccurate.

I first discuss the documentary evidence tying Mr. McIntyre to the communications with Victim A and Victim B. (Sections IV.A and B) I then discuss McIntyre's recorded confession (IV.C) and his trial testimony (IV.D). Finally, I discuss the 404(b) evidence further establishing identification. (IV.E)

### A. Counts 1–4 ("Victim A"): Documentary evidence of identification

Counts 1, 2, 3, and 4 of the Superseding indictment charge that the defendant, via Facebook, threatened and coerced a 12-year-old girl, Victim A, to create and send him sexually explicit images of herself. McIntyre denies that he was the person who sent or received these communications, or at least the subset of these communications that was criminal in nature.

The independent documentary evidence of guilt was strong. To begin with, of course, the government introduced copies of the internet communications themselves, including the photographs that Victim A took of herself. Realistically, there can be no dispute that these communications occurred, that they constituted threats, or that the photos sent in response were sexually explicit depictions of a minor.

7

Records of the "Brandon Facebook Account"[3] used to make and receive these communications demonstrated that the account was registered to Brandon McIntyre. (G10a–10c) The registrant gave a cellphone number of (908) 514-0219; McIntyre's email address of mcintyrebrandon73@yahoo.com; and a home address of Annandale, New Jersey, where McIntyre at times had lived with his grandparents. (See Tr. 750:9–10, 1081:15–21.)

When the Brandon Facebook account was opened, Facebook verified the link between the Account and cellphone number (908) 514-0219 by sending a text message to the cellphone with a clickable link. (Tr. 651:19–22) The cellphone carrier was Verizon Wireless, whose records revealed that the phone number (part of a family plan) was registered to the defendant's mother. (G60, 64; Tr. 751:20–25; 864:6–11; 868:6–869:9; 1079:5–7) Defendant's grandfather testified that (908) 514-0219 was the number used by Brandon McIntyre. (Tr. 1085:18)

All IP addresses accessing the Brandon Facebook Account were Verizon Wireless addresses. (Tr. 863:15–23; 861:9–16) The only electronic device accessing that Facebook account was an Android Droid Razr phone, the model used by defendant. (G10a; Tr. 861:5–22) On the day of the defendant's arrest, Special Agent Matthews of the FBI recovered a Droid Razr from the defendant's car and verified that it was assigned telephone number (908) 514-0219 by calling that number. (Tr. 869, 872, G50) The Droid Razr phone had the email address of mcintyrebrandon73@yahoo.com, associated with the Brandon Facebook Account, listed in contacts as "my email." (G51a; Tr. 878:6–16) Contacts on the phone included McIntyre's mother and grandfather (as well as Victim B). (G 51a; Tr. 872:25–875:2)

The messages between the Brandon Facebook Account and Victim A are also tied to McIntyre by their content. The sender attached photographs of Brandon McIntyre, easily identifiable as such by the jury. (G13 pp. 15906–16)

---

3    So called to distinguish it from the "Katie Facebook Account," see infra, maintained by McIntyre under the alias of "Katie Thompson."

8

The sender also provided Victim A with his cell phone number: McIntyre's number, (908) 514-0219. (G13 p. 15893; Tr. 793:4–7)

This evidence, even standing alone, would support a jury finding beyond a reasonable doubt that the defendant was the person responsible for the communications underlying Counts 1–4. There was, however, considerable additional identification evidence, summarized below.

### B. Counts 5–6 ("Victim B"): Documentary evidence of identification

The messages between the "Katie Thompson" Account and Victim B, summarized above, were admitted in evidence (G2). The documentary evidence tying the Katie Facebook account to Brandon McIntyre was as follows.

The Facebook records (G1a, b, & c, G2) reveal that the Katie Facebook Account was accessed only by an Android Droid Razr cellphone, the model carried by McIntyre. The IP addresses associated with the account were all addresses associated with Verizon Wireless, the defendants' cell phone service provider. (G 1a; Tr. 860:2–24) A comparison of the IP addresses listed for the Brandon and Katie Facebook accounts suggested that a single individual was using both. (Tr. 752:16–754:11; G 1a, 10a) A match of "cookies," too, established that the same electronic device was used to access the Brandon and Katie Facebook accounts. (G 5, 15; Tr. 899:7–902:14)

The messages between the Katie Facebook Account and Victim B are also tied to McIntyre by their content. In the initial contact, "Katie" introduces Brandon McIntyre, said to be present with her, and then excuses herself temporarily, leaving "Brandon" to begin messaging Victim B on his own. (G2 pp.479–81) "Katie," throughout, shows a suspiciously high level of interest in Victim B's agreeing to date Brandon, and, attempting to coerce Victim B, echoes Brandon's threats to Victim A. The Katie Facebook Account also sends to Victim B the same clothed photographs of Brandon McIntyre that McIntyre had sent to Victim A. (*Compare* G2 pp. 486–90 *with* G13 pp. 15906–16.)

"Katie," on the Katie Facebook account, provides Victim B with Brandon McIntyre's cell phone number, (908) 514-0219, and encourages her to text message with Brandon. (Tr. 736:25–737:12; G2 p. 496) Verizon records confirm

9

the testimony of Victim B (and later of McIntyre himself) that they did text each other. (G 63; Tr. 867:7–868:5) If the user of the "Katie" account were operating behind McIntyre's back, it would have made little sense to put Victim B directly in touch with McIntyre.

This evidence, even standing alone, would support a jury finding beyond a reasonable doubt that the defendant was the person responsible for the communications underlying Counts 5 and 6. There was, however, considerable additional identification evidence, summarized below.

### C. Recorded Confession

On the day of his arrest, September 11, 2014, Brandon McIntyre was interviewed by Special Agents in a vehicle outside of his residence. The interview was recorded.

SA Matthews testified that McIntyre was not coerced in any way or promised anything in return for his statement. (Tr. 757:12–18) Matthews introduced in evidence a signed advice of rights form (G32) in which McIntyre waived his right to remain silent. (Tr. 760:4–761:15; see also G30a at 1–2 (oral advice of rights); Tr. 766:6–16.) Audio excerpts of the interview were played to the jury, which had before it a transcript. (G30, 30a)

In the interview, Mr. McIntyre admitted that he used a Droid Razr phone in the relevant period. (G30a at 4, 11, 45) He acknowledged that the phone number was (908) 514-0219. (G30a at 27)

He acknowledged that the Brandon Facebook Account was his and that he was the only one who controlled it. He identified the associated email address, McIntyreBrandon73 @yahoo.com, as his own. (G30a at 8, 18) Although he complained of hacking, he said this particular account had not been hacked. (G30a at 18) He acknowledged that he used the Katie Thompson Facebook Account as well, and identified the associated email as KatieThompson51@yahoo.com. (G30a at 14–15)

He signed a form authorizing the agents to access the accounts, and gave them the passwords, which were known to him, although he was not completely clear as to which corresponded to which account. (All used the

10

number "51" in honor of McIntyre's favorite baseball player.) (G30a at 7, 23–32; G 40; Tr. 773:1–9)

McIntyre specifically admitted that he had Facebook contact with Victim A and that she had said her age was 12. (G34–35; Tr. 780:9–22) He acknowledged that he had sent her a picture of his penis, and signed and dated a copy of the picture. (G30a at 37; G34a; Tr. 791:10–21; Tr. 796:14–797:17). He was shown the printout of the Brandon Facebook Account messages, including the images of himself he sent to Victim A and the nude images that Victim A sent to him. (G34; see also 13, 13a, 13b, 13c, 13d) McIntyre signed or initialed each of those images, signifying that he recognized them as the ones he had received them from Victim A. (G30a at 38–41; G34a; Tr. 781:2–785:5) He signed and acknowledged sending Victim A the clothed and recognizable photos of himself from the Brandon Facebook Account. (G34a; Tr. 796:8–12)

The agent went through some of the Facebook messages to and from Victim A. McIntyre admitted that he had demanded that Victim A send pictures of her genitals and threatened her with prison and prison rape "for failure to comply with an officer's order." (G30a at 42) He admitted that he had demanded and received a picture of Victim A's genitals, and then required her to send him what he deemed a better image. (G30a at 50-51)

SA Matthews then went through some of the messages to and from Victim B. (G30a at 57) McIntyre admitted that "Katie Thompson" was an alias that he had used when messaging with Victim B. (G30a at 59–60) He admitted that Victim B informed "Katie" that she was fourteen years old, and that "Katie" gave Victim B Brandon's cell phone number, (908) 514-0219. (G30a at 60) He admitted to trying to get Victim B to meet him in Lake Placid, New York. (G30a at 62) He admitted mentioning the Mafia and threatening the life of Victim B's boyfriend. (G30a at 63) He acknowledged that even at the time, he understood "to some extent" that Victim B was frightened by the threats to harm her boyfriend or jail her parents. (G30a at 65–66) The agent went through the more graphic threats, including prison, torture and killing, and McIntyre acknowledged that he remembered making them. (G30a at 67–69)

11

### D. Defendant's Trial Testimony

Mr. McIntyre testified in his own defense. (Tr. 947 *et seq.*) In the course of offering an alibi or explanation, however, he could not avoid confirming major components of the government's case.

McIntyre admitted that he, as a 21-year-old man, had struck up an internet friendship and exchanged text messages with the 12-year-old Victim A. These, he said, contained no threats or obscene material. The Facebook messages containing the objectionable material, he denied sending. He denied that he sent or received photos to or from Victim A. (Tr. 947–48)

His testimony as to Victim B was similar. He admitted to text messages, which had contained nothing untoward, but denied sending or receiving the obscene or threatening Facebook messages. (Tr. 949–50)

McIntyre acknowledged that his recorded confession was genuine, but denied its accuracy. He said that he was under pressure and nervous when he made the statements. (Tr. 950)

Defendant then offered a factual defense that came as a surprise. The real culprit, he said, was a person named Bryan Gene, now in Alabama. (Tr. 951) McIntyre testified that he knew Gene from his Navy days. In fact he had been discharged for permitting Gene, a civilian, to live in the barracks. (Tr. 952) McIntyre and Gene then lived together in New Jersey for a time, and thereafter Gene would visit from time to time. Gene allegedly had access to McIntyre's cell phone at the relevant times. (Tr. 953–55) When he gave the statement to the FBI, McIntyre said, he did not believe he would be able to locate Gene in Alabama, and felt that he had to take responsibility for what happened on his account. (Tr. 955–56) But Gene, he said, was the person who had engaged in the illegal Facebook communications, while posing as McIntyre.

Counsel for the government then cross-examined Mr. McIntyre. (Tr. 958 et seq.) Cross-examination established, among other things, that the illegal Facebook messages continued after the date that McIntyre claimed to have discovered the misuse of his account. (Tr. 967–68, 1028) He implausibly described a pleasant and unobjectionable relationship with Victim A via text

12

messages at the same time the parallel threatening and obscene Facebook communications were occurring without his knowledge. (Tr. 968–69)

McIntyre admitted to creating the Katie Thompson Facebook account, which he used "to get information" from people. (Tr. 969, 1016) He stated that he had reviewed the Katie Thompson Facebook records before the date of arrest, which is why he was familiar with their contents when he made his statement to the agents. (Tr. 1034)

He denied ever telling anyone that he was a police officer or that his father was a police commissioner, but did admit telling people he was studying to be a state trooper. (Tr. 1019) He acknowledged having had family members by marriage in Lake Placid, the site of the proposed meeting with Victim B. (Tr. 1031)

SA Matthews then testified in a manner intended to refute McIntyre's testimony that Bryan Gene, not he, had sent the messages.[4]

Thereafter, against his attorney's advice, McIntyre sought to take the stand again. After a proffer of proof that one other person had access to the defendant's cell phone, I permitted him to do so. (Tr. 1116–21) McIntyre then testified that not one, but three more persons had access to his phone: Kevin Weske, Tom Zengel, and Greg Garcia. He stated that he and these friends used to trade their phones around, apparently just for diversion. (Tr. 1122–26) The testimony of SA Matthews and his review of the Victim B messages, said McIntyre, had jogged his memory of this. (Tr. 1126, 1128)

---

[4] SA Matthews later testified on rebuttal that, during a period when Brandon McIntyre was incarcerated, there were no outgoing messages from the Brandon McIntyre 7545 account or the Katie Thompson Facebook account. ((Tr. 1092)

Matthews's analysis also suggested a close temporal relationship between the threatening messages from "Katie" account to Victim B and the texts from the (908) 514-0219 number to Victim B. (G 121; Tr. 1094–1100) For the messages to have occurred seconds or minutes apart, the telephone would need to have been passed back and forth, not left in the custody of, *e.g.*, Bryan Gene.

13

### E. 404(b) Identification Evidence

Based on the defendant's denials that he was the perpetrator, and his attempt to attribute the communications to another person, the government proffered certain identification evidence under Fed. R. Evid. 404(b). To be admitted, such "other acts" evidence must pass a fourfold test:

> *first*, . . . the requirement of Rule 404(b) that the evidence be offered for a proper purpose;
>
> *second*, . . . the relevancy requirement of Rule 402 . . . ;
>
> *third*, . . . the assessment the trial court must make under Rule 403 to determine whether the probative value of the similar acts evidence is substantially outweighed by its potential for unfair prejudice, . . . and
>
> *fourth*, that the trial court shall, upon request, instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted.

*Huddleston v. United States*, 485 U.S. 681, 691–92, 108 S. Ct. 1496, 1502 (1988) (*italic* emphasis and line breaks added).

I performed the necessary analysis and Rule 403 balancing, and admitted the evidence for a limited purpose, confined to the identification of the defendant. (Tr. 1036 et seq) I delivered the necessary limiting instructions, both when the evidence was admitted and in my jury charge. (Tr. 1053–54, 1065–66, 1166–68)

#### "Amber"

The government introduced an in-court statement under oath by the defendant, dated February 25, 2014. In it, he admitted that he had exchanged text messages with "Amber," an adult woman of 24. (G110a; Tr. 1039, 1067) He acknowledged that he had "vented [his] anger" to Amber, had represented himself as a police officer, and had threatened to have her arrested and have her child taken away. (Tr. 1040–41)

The government also introduced in evidence the Brandon Facebook Account messages to Amber. (G120; Tr. 1042 *et seq.*) In them, McIntyre's

14

objective is to "hang" with Amber, who resists. McIntyre threatens to have Amber's boyfriend thrown in jail, claiming that he is a state trooper and that his father is a state police commissioner. He advises her as to the minimum sentence of ten years and fine of $3500, and says that the boyfriend will never again be allowed to be around children. (Tr. 1043) Later, he threatens Amber herself with a criminal conviction for "threatening an officer" (*i.e.* himself), which he says carries a sentence of ten years' imprisonment and a $5,000 fine. Her daughter, he threatens, will be placed in foster care. (1045–46) He uses the name "Princess" to refer to Amber. (Tr. 1044)

McIntyre denied the truth of his admissions under oath in court, stating that there were "reasonings behind" his making of false statements. (Tr. 1047) His attorney at the time, he said, advised him to do it as part of a plea deal.[5] (Tr. 1049–50; 1067–68) The government proffered Mr. McIntyre's additional description of the Amber communications in his recorded confession to the FBI. (G30b, 30c) Although I had initially been inclined to exclude this evidence as cumulative, I admitted it in light of the defendant's denials. (Tr. 1048–49)

I instructed the jury that this evidence would be admitted for a limited purpose only: "the identity of the person . . . who had the Facebook exchanges with [Victim A] and [Victim B], which are the charges in this case." (Tr. 1052). At the time, I instructed the jury at length on the permissible uses of this Rule 404(b) evidence. (Tr. 1053–54) I also instructed the jury at the end of the case regarding the proper use of Rule 404(b) evidence. (Tr. 1166–68)

The "Amber" evidence was firmly tied to McIntyre by his own admissions under oath in an earlier proceeding, as well as his confession to the FBI. It was properly admissible to prove that the same person, McIntyre, had engaged in the charged communications with Victims A and B. And the government properly used the "Amber" evidence for that permissible purpose.

---

5    I originally ordered the government to sanitize the transcript so it would not reveal that the statements were made in the context of a criminal case. It was the defendant himself who, in an attempt to explain away his confession under oath, revealed that this was part of a guilty plea deal. (Tr. 1067-69)

15

Government counsel, in her summation (Tr. 1208–14), pointed out that McIntyre told Amber to contact him at phone number (908) 514-0219. She pointed to a stylistic tic common to the text messages to Amber, Victim A, and Victim B: the capitalization of the first letter of each word. She noted that the composer of the messages addressed both Amber and Victim A as "Princess." And finally, the threats were distinctive enough to suggest a common *modus operandi.* To Amber, and also to Victims A and B, the writer identifies himself as a state trooper or trainee and says his father is the police commissioner. In all three cases, he threatens to use his connections to have the recipients (and their parents or associates) criminally charged. The threats explicitly include separation of parent and child. As to Amber, and also as to Victims A and B, the writer's anger is triggered references to a rival or boyfriend, against whom he directs a separate threat of criminal conviction and incarceration. Unusually, in each case the threat includes not only of the maximum sentence of imprisonment, but also the dollar amount of the statutory fine.

### "Emmy"

Also admitted as Rule 404(b) identity evidence was an exchange of messages with "Emmy," an adult, in February 2014. (Tr. 1058–64; G 119) In that exchange, emanating from the Brandon Facebook Account, Mr. McIntyre verifies his identity by sending a recognizable picture of himself with "Emmy" written on his hand. McIntyre admitted on the witness stand that he was the one sending those messages to Emmy. These "Emmy" exchanges—definitively tied to McIntyre—interlocked with the messages to Victims A and B in way that suggested the same person was responsible for each.

First, McIntyre sends Emmy some of the same clothed photos of himself that were sent to Victim A. Second, he tells Emmy that girls of 12 and 13 were "hitting on [him]." (Tr. 1060) The jury could reasonably have concluded that this was a direct reference to Victim A, who was in fact 12 years of age. (Tr. 1061) Third, McIntyre tells Emmy that girls were interested in him because he "look[s] like Taylor Lautner in person." (Tr. 1060) McIntyre's supposed

16

resemblance to that actor was a feature of "Katie's" introduction of McIntyre to Victim B.[6]

Again, in keeping with Rule 404(b), I instructed the jury at length regarding the limited permissible purposes of the "Emmy" evidence. (Tr. 1065–66) And the government, in summation, confined itself to those permissible purposes. (Tr. 1214–17)

## CONCLUSION

The evidence summarized above provided a more than ample basis for the jury to find beyond a reasonable doubt that the person who sent and received the messages on which the charges were based was the defendant, Brandon McIntyre. The evidence was strong, and there was no error or procedural unfairness that would require a new trial.

For the foregoing reasons, the post-trial motion (ECF nos. 118, 127) of the defendant, Brandon McIntyre, for a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29(c), or for a new trial, pursuant to

---

6     McIntyre, in his role as "Katie," enticed Victim B to contact McIntyre by touting his resemblance to the actor:

> Q. Okay. And did Katie Thompson tell you in another message later on why she referred to Brandon McIntyre as Twilight boy?
>
> A. Yes.
>
> Q. And what was her reason?
>
> A. Because he looks like Taylor Lautner.
>
> Q. What is Twilight? What is that in reference to; do you know?
>
> A. I believe a movie.
>
> Q. And what's the relation between Taylor Lautner and Twilight?
>
> A. He is an actor in the movie.

(Tr. 730–31 (testimony of Victim B))

Lautner appeared in the *Twilight* films in 2008–10. A teenager himself at the time, he was popular with teenaged girls. *See* www.imdb.com/name/nm1210124/.

Although it was not highlighted to the jury, McIntyre also messaged Victim A that he would pick her up "like jacob does to bella" (G 13 p. 15855), another apparent reference to *Twilight* and the character played by Lautner.

Federal Rule of Criminal Procedure 33, is **DENIED**. An appropriate Order will be filed with this Opinion.

Dated: May 24, 2018

_____
**KEVIN MCNULTY**
**United States District Judge**